Brady, J.
With the trial and disposition of this c. 21E/c. 93A case behind them, the parties each move for attorneys fees and costs under G.L.c. 21E, §4A(d) and (f). Plaintiff seeks $676,297.00 in attorneys fees, and $131,814.53 in expert witness fees and costs for a total of $808,111.53. Defendant opposes plaintiffs application, and seeks for itself fees and costs in the amount of $386,002.52. Notwithstanding the intensity with which this litigation has been waged, and that potentially $1,194,114.01 is at stake, neither party has requested a hearing. After review of the parties’ detailed submissions, for reasons which follow, I DENY each party’s fee applications.

G.L.c. 21E, §4A

Chapter 2IE, §4A spells out a procedure to be followed by a party who has undertaken or is undertaking a response action who asserts that others may be responsible for contribution, reimbursement, or equitable share of the pollution clean-up costs. The statute contemplates notification, exchange of information, negotiation, mediation, and hopefully a reso *729 lution among potentially liable parties. Those parties against whom an assertion of liability is made are not obliged to engage in the process, but if they do not, they may be liable to plaintiff, pursuant to subsection (d), for litigation costs and reasonable attorneys fees if they are later found responsible at trial, and:
(1) failed without reasonable basis to make a timely response to a notification pursuant to this section, or
(2) did not participate in negotiations or dispute resolution in good faith, or
(3) failed without reasonable basis to enter into or carry out an agreement to perform or participate in the performance of the response action on an equitable basis or pay its equitable share of the cost of such response action or of other liability pursuant to the provisions of this chapter, where its liability was reasonably clear.

Newly Weds’Application

In October 1995 NewlyWeds discovered oil contamination on the site which it purchased from Westvaco in 1981. In August 1996, Newly Weds’ local counsel, Robert Curry, sent a G.L.c. 21E, §4A notice letter to Westvaco. Westvaco turned the matter over to its in-house counsel, Francis Murphy. Curry’s letter described in reasonable detail the discovery of an abandoned underground storage tank (UST) and surrounding oil contamination in October 1995, and the response action to date. The letter enclosed copies of Newly Weds’ consultants’ reports, and set forth the costs incurred to date. Curry asserted that it was
apparent that the Westvaco UST is the principal source of contamination at the Property and will be the principal concern in remediating the site to a level of “no significant risk” as required by the Massachusetts Contingency Plan. Westvaco did not disclose the existence of this tank to NWF at the time of the sale of the Property to NWF. NWF has never assumed ownership or responsibility for operation and/or closure of this tank in accordance with applicable laws and regulations. The responsibility for this tank rests entirely with Westvaco.
Curry demanded that Westvaco reimburse it for all of its expenditures incurred to date, and asserted that Newly Weds would hold Westvaco for any other damages arising out of the presence of the UST.
Murphy, upon receipt of the letter, undertook an investigation. Because Westvaco had not been involved with the site since it sold it to Newly Weds 15 years before, his investigation did not turn up anyone with any knowledge or information about any oil releases at the site. He was able to obtain the sales documents, including the option agreement that provided that Westvaco sold the property to NewlyWeds “as is.” Murphy’s c. 21E, §4A response letter was brief and to the point. He disagreed with Mr. Curry’s contention that the oil released at the site must have come from oil put in the tanks prior to 1981 because the released oil was No. 6 fuel oil and Newly Weds used only No. 4 fuel oil, pointing out that the consultants had found the presence of No. 4 fuel oil in soil and groundwater at the site as well. Mr. Murphy also pointed out, citing Marenghi v. Mobil Oil Corporation, 420 Mass. 371 (1995), that under c. 21E, a former owner of property like Westvaco is not responsible for a claim involving a release of oil during that party’s ownership unless the claimant can establish that the former owner actually caused the release. In that respect, he said that Newly Weds had presented no information that Westvaco had acted “negligently in its alleged use of any tank at the Site or otherwise caused the release of oil.”
There the matter stood between them until 1999, when Newly Weds filed the subject lawsuit seeking to recover under c. 21E, §4 for its past response costs, and under c. 93A, §11 for property damage and punitive damages. The litigation proceeded in the usual manner. The docket does not reflect any serious discovery disputes. In the'fall of 2000, the parties cross moved for summary judgment, which motions were denied in December 2000.
A favorable development in the case for NewlyWeds was the testimony of Richard Sargeant who was deposed in August 2000. Sargeant was a former Newly Weds maintenance supervisor, who testified to certain conversations that he had with one James Fucci. Mr. Fucci worked for Westvaco from the 1960s, and continued to work for Newly Weds in the maintenance department after the 1981 sale. He died in 1993. According to Sargeant, Fucci told him about an excavation which occurred in 1979 in which an underground storage tank, “all messy with oil,” was uncovered. The testimony indicated that probably Westvaco stopped using the old tank in 1979, filled it with sand, left it in place, and installed a new underground storage tank nearby which it connected by piping to the boiler. It was the new underground storage tank which was in place when Newly Weds purchased the property, and which it continued to use until it converted its heating system to natural gas in 1995. The testimony provided evidence upon which Newly Weds could argue that Westvaco was negligent in failing to remove the contaminated soil.
The affidavits filed with the cross applications for fees indicate that the parties began to negotiate in May 1991. The parties utilized a mediator, and several offers and counteroffers were exchanged. At the beginning of trial, the parties’ settlement positions stood thus: Westvaco offered $225,000.00; Newly Weds demanded $515,000.00, plus an agreement by Westvaco to pay any future response costs.
The Chapter 2 IE, §4 claim was tried to a jury, which determined the reasonable response costs sustained by plaintiff to be $257,393.19 and, after rejecting plaintiffs “innocent owner” defense under Section 5(b) of c. 21E, equitably allocated 25% of the response costs to the plaintiff and 75% of the response costs to *730 the defendant.[1] The Court heard the 93A claim jury-waived and found for Westvaco.
Mr. Murphy’s rejection of Newly Weds’ §4A demand was not unreasonable or in bad faith. Westvaco’s liability was never “reasonably clear.” At the outset, during the §4A process, the apparent fact pattern was similar to those held to be insufficient under Griffith v. New England Tel. & Tel. Co., 420 Mass. 365 (1995), and Marenghi v. Mobil Oil Corporation, 420 Mass. 371 (1995). In substance, a present owner/plaintiff cannot recover from a former owner for oil contamination simply by proving that an underground storage tank leaked petroleum during defendant’s ownership. Proof of causation requires some form of conduct as a result of which the release of oil occurs.[2]
Newly Weds’ own fee expert lends support to Westvaco’s position that its denial of liability was not unreasonable. Newly Weds filed an affidavit of Arthur P. Kreiger, an experienced environmental law attorney, who evaluated its charges in the case and opined that they were reasonable. In the course of explaining his opinion that the fees and charges were reasonable (notwithstanding that they are very high), Mr. Kreiger pointed out that: “This was a difficult case for NewlyWeds, for several reasons. It involved (a) an ‘as is’ agreement with Westvaco, (b) old and obscure facts about UST’s best known to people who had died, (c) a difficult burden of proof on causation on its Chapter 2IE, §5(a)(5) claim under Griffith, Marenghi and subsequent cases . . .” What Mr. Kreiger says is quite true. But those are the same factors which demonstrate the reasonableness and good faith of Westvaco’s decision not to settle.
Somewhat inconsistently, Mr. Kreiger goes on to argue that the legal time involved was high because Westvaco employed a “Stalingrad defense.” This metaphor implies a defender, bound to lose, against whom the odds are hopelessly stacked, but who insists on raising every point in fighting the case to the last. The image does not work in this case. If Newly Weds had a tough case, which it did, it was because Westvaco had relevant and important points to assert in its defense. Furthermore, nothing which I observed about Westvaco’s conduct in this case raises in my mind the notion that its vigorous defense was anything other than appropriate behavior.

Westvaco’s Fee Application

Westvaco seeks recovery of its own substantial fees and costs. It relies on c. 21E, §4A(f), which provides: “If the court finds that (1) the plaintiff did not participate in negotiations or dispute resolution in good faith, (2) the plaintiff had no reasonable basis for asserting that the defendant was liable, or (3) the plaintiffs position with respect to the amount of the defendant’s liability pursuant to the provisions of this chapter was unreasonable, it shall award litigation costs and reasonable attorneys fees to the defendant.” The main point of Westvaco’s argument is that throughout the case Newly Weds repeatedly misrepresented facts concerning its fuel usage at the site. I reject Westvaco’s petition.
First, as I construe G.L.c. 21E, §4A, the Legislature contemplated pre-suit negotiation. The negotiation that finally occurred between the parties here was well after the lawsuit was in full swing. Westvaco itself turned away attempts to negotiate before developments in the suit changed its thinking.
Second, I do not regard any misstatements which initially may have been made by Mr. Curry about Newly Weds’ fuel usage as sinister. Nor was Yee’s omission of Newly Weds’ use of No. 2 fuel oil intended to mislead Westvaco. The facts of the case were and are complicated. Yee's analysis identifying the presence of No. 2 fuel oil was contained in later reports; there was no intentional cover-up. Westvaco’s arguments with respect to Newly Weds’ alleged deceptions are exaggerated.
Although Newly Weds’ settlement positions taken during the litigation seem to me very aggressive, and in retrospect overly optimistic, I do not regard them as having been advanced in bad faith or beyond the outer reaches of reasonableness.

Conclusions

This case was well prepared and well tried. It involved interesting and complicated issues. The judge and jury appreciated counsels’ advocacy. It is unfortunate that $1.1 million had to be devoted to litigation, an essentially unproductive endeavor, and in hindsight, perhaps Mr. Murphy should not have turned off Newly Weds’ overtures at the outset, notwithstanding Mr. Curry’s insistence that Westvaco was responsible for everything and then some. Perhaps Newly Weds’ stance would have been modified, with some friendly meetings and the aid of a mediator, who might have stressed the difficulties which Mr. Kreiger noted, before trench warfare began. Similarly, it is easy to say once jury and judge have spoken, that NewlyWeds was too fond of its case, especially the c. 93A claim, once trial loomed and negotiations began. But I simply cannot fault counsel and their clients for failing to predict the future with perfect accuracy. Because this case does not present bad faith or unreasonable conduct regarding settlement, the only fair resolution, in my view, is that the parties should be left to suffer with their own attorneys fees and litigation costs.

ORDER

For the reasons stated above, plaintiff Newly Weds Foods, Inc.’s petition for an award of fees and costs pursuant to M.G.L.c. 2IE, §4A is DENIED, and the fee application of defendant Westvaco Corporation is, likewise, DENIED.

 By stipulation, $18,870.00 is to be added to this award for the fair value of labor of plaintiffs employees associated with the response actions. The Court also determined that the plaintiff incurred $24,128.40 for attorneys fees prior to litigation which are also recoverable as response costs. Therefore, the total response costs, exclusive of interest, which will be allocated pursuant to the jury verdict are $300,391.59.

 describing the conduct required to establish liability is not easy. From my handwritten notes, I charged the jury essentially as follows concerning liability under c. 21E, §5(a)(5): “Plaintiff must prove that some conduct of the defendant, either an act or a failure to act, caused the release of oil. The statute does not describe the type of conduct necessary to establish liability. If the plaintiff establishes, as it alleges here, by a fair preponderance of the credible evidence, that the defendant acted unreasonably in some manner with respect to the UST, by for instance improper installation of a tank without appropriate means of access for maintenance of the tank, or leaving the tank in the ground for an unreasonable length of time, or by failing to detect a leak by reasonably monitoring or maintaining the tank, or by leaving the tank in the ground when it knew or should have known that it was releasing or was likely to release oil, or if defendant knew or should have known that oil was released into the ground from the tank and unreasonably failed to remove the contaminated soil, then that would be sufficient conduct to establish liability, provided that plaintiff has also shown that the conduct caused the contamination which required remediation."